UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

JAVADO AUDRIC THOMPSON,

      Plaintiff,

v.                                Case No. 3:11cv423/RV/CJK

M. NICHOLS, et al.,

      Defendants.

_____/

## REPORT AND RECOMMENDATION

This prisoner civil rights case, brought under 42 U.S.C. § 1983, is before the court upon the defendants' motion for summary judgment. (Docs. 78, 80).[1] Plaintiff has responded in opposition. (Docs. 82, 83). The matter is referred to the undersigned Magistrate Judge for report and recommendation pursuant to 28 U.S.C. § 636 and N.D. Fla. Loc. R. 72.2(C). After careful consideration, the undersigned recommends that the motion for summary judgment be granted.

## BACKGROUND AND PROCEDURAL HISTORY

Plaintiff, a Florida prisoner, initiated this lawsuit on September 5, 2011, by filing a civil rights complaint pursuant to 42 U.S.C. § 1983. (Doc. 1). On November

---

[1] The references to document and page numbers will be to those automatically generated by the CM/ECF system.

29, 2012, plaintiff filed the third amended complaint, the operative pleading in this action. (Doc. 12). The third amended complaint names two members of the medical staff at Santa Rosa Correctional Institution ("Santa Rosa CI") as defendants: Nurse M. Nichols and Dr. W.D. Rummel. (Doc. 12, p. 1-2). Plaintiff claims the defendants violated his rights under the Eighth Amendment by failing to change his diet or otherwise provide medical care after he complained of headaches, cold sweats, dizziness, weakness, weight loss, fainting, and a numb left arm. (Doc. 12). For relief, plaintiff seeks $120,000 in damages. (*Id.*, p. 9).

On July 11, 2014, defendant Nichols moved to dismiss the third amended complaint, claiming plaintiff failed to exhaust his administrative remedies and failed to state a claim upon which relief can be granted. (Doc. 50). The court denied the motion to dismiss (docs. 57, 58), Nichols filed her answer to the complaint (doc. 60), and discovery commenced (doc. 61). Defendant Rummel then filed his answer to the complaint. (Docs. 71, 75).

On July 30, 2015, the defendants moved for summary judgment. (Doc. 78). Defendants argue: (1) plaintiff received constitutionally adequate medical care; (2) Rummel cannot be held liable in his supervisory capacity; (3) both Nichols and Rummel are entitled to qualified immunity; and (4) plaintiff is unable to recover

monetary damages absent a physical injury.  (*Id.*).  Plaintiff filed his response in opposition on August 17, 2015.  (Docs. 82, 83).

## FACTS

The following facts are drawn from plaintiff's verified third amended complaint (doc. 12) and the evidence in the summary judgment record (docs. 78, 82). *See Perry v. Thompson*, 786 F.2d 1093, 1095 (11th Cir. 1986) (holding that specific facts pled in a sworn complaint must be considered in opposition to summary judgment).  Where the parties offer conflicting accounts of the events in question, the court "sets forth the facts, drawn from the evidence presented, in the light most favorable to the plaintiff." *See Snow ex rel. Snow v. City of Citronelle*, 420 F.3d 1262, 1265 (11th Cir. 2005).

Plaintiff arrived at Santa Rosa CI on July 23, 2010.  (Doc. 78-1, p. 1).  He first visited Santa Rosa CI medical staff on a sick call on October 11, 2010.  (Doc. 78-4, p. 2).  He spoke with Nurse Austin and complained of light-headedness, weakness, joint pain, chest pain, and left arm numbness.  (*Id.*).  Defendant Nichols, an Advanced Registered Nurse Practitioner, reviewed plaintiff's chart and ordered lab work to evaluate his complaints.  (Doc. 78-1, p. 1; doc. 78-4, p. 2).  The lab work revealed plaintiff had hyperthyroidism; Nichols did not order treatment at that time but she

scheduled follow-up testing.  (Doc. 78-1, p. 1; doc. 78-4, p. 3).  Nichols examined

plaintiff on October 20, 2010, and found no physical problems.  (*Id.*).

On November 14, 2010, plaintiff submitted an Inmate Request indicating he

was "getting extremely hungry about . . . 45 minutes to an hour after" eating.  (Doc.

78-7, p. 2).   He also indicated he experienced sweating, weakness, and

lightheadedness.  (*Id.*).  In response to the request, Nichols ordered another thyroid

profile on November 15, 2010.  (Doc. 78-4, p. 4).  The results indicated plaintiff's

"T4 level" was elevated; Nichols started plaintiff on a beta blocker to reduce his heart

rate.  (Doc. 78-1, p. 1; doc. 78-4, p. 4).

On December 1, 2010, Nichols spoke with plaintiff, discussed his lab results,

and informed him why she prescribed the beta blocker.  (Doc. 78-4, p. 5).  Nichols

noted plaintiff's weight had dropped to 146 pounds.  (*Id.*).  Nichols continued the beta

blocker and issued a 4000 calorie diet pass to address the weight loss.[2]  (Doc. 78-1,

p. 1; doc. 78-4, p. 5).

Staff continued to monitor plaintiff's thyroid condition.  (Doc. 78-4, p. 7).

Nichols indicates, "[b]y February 16, 2011, [plaintiff's] hyperthyroidism had resolved

and his labs showed a TSH of 6.5 - hypothyroidism."  (Doc. 78-1, p. 1; doc. 78-4, p.

---

[2] "A 4000 calorie diet is the same food as a regular [diet] with extra sandwiches which add
the extra calories."  (Doc. 78-1, p. 1).

8).  Nichols examined plaintiff again on March 2, 2011, and discussed the lab results. (Doc. 78-1, p. 1; doc. 78-4, p. 11).  Plaintiff complained of anxiety attacks and stated he was not taking the beta blocker.  (*Id.*).  He weighed 160 pounds.  (*Id.*).  Because plaintiff's hyperthyroidism had resolved and his weight was up, Nichols discontinued the beta blocker and 4000 calorie diet.  (*Id.*).  Nichols also suggested that plaintiff visit a psychologist for his anxiety.  (*Id.*).  Medical staff conducted additional blood tests on April 4, 2011, to check the status of plaintiff's thyroid.  (Doc. 78-4, p. 12). On May 4, 2011, plaintiff submitted an Inmate Request seeking a renewal of his diet pass due to concerns about his weight.  (Doc. 78-7, p. 1).  Nichols responded, "you don't need a diet, your [weight] is fine."  (*Id.*).

Plaintiff filed an informal grievance on May 12, 2011, alleging the medical staff was not taking his condition seriously and could "not identify what is the real problem causing [his] weight los[s], dizziness, and extra hunger after eating particularly Monday's pancake breakfast, Wednesday's french toast, and Saturday coffee cakes and oatmeal."[3]  (Doc. 82-1, p. 41-42).  Plaintiff recognized his thyroid condition was being monitored but stated "it's clear that I'm having problems with

---

[3] Plaintiff has suggested Nichols retaliated against him for filing the May 12, 2011 grievance by failing to see him or provide a diet change.  (Doc. 12, p. 5; doc. 82, p. 4; doc. 82-1, p. 70; doc. 83, p. 1).  As noted in the undersigned's February 27, 2015 report and recommendation, plaintiff has not raised a constitutional retaliation claim under the First Amendment.  (Doc. 57, p. 14).

my diet and Ms. Nichols don't think I need a diet but she is not doing or did not provide any medical solution to help my condition." (*Id.*, p. 42).  Plaintiff requested that he be provided "with whatever medical assistance it takes to stop my suffering or to send me to a specialist that can identify and solve this problem[.]" (*Id.*).  The grievance was denied on May 17, 2011; the response directed plaintiff "to go to sick call with the medical concerns you voice in this grievance." (*Id.*, p. 41).  The response informed plaintiff the nursing staff would evaluate plaintiff's condition and, if needed, refer him to a clinician; if necessary, the clinician would refer him to a specialist.  (*Id.*).

On May 21, 2011, plaintiff filed a formal grievance. (Doc. 82-1, p. 51-52).  The grievance reiterated the allegations set forth in the informal grievance and emphasized plaintiff had complained to medical staff about his condition on many occasions.  (*Id.*).  Plaintiff's formal grievance was denied on May 31, 2011.  (*Id.*, p. 50).  Dr. Rummel's response to the formal grievance paralleled the response plaintiff received to the informal grievance; plaintiff was directed  to sign up for a sick call and undergo an evaluation by the nursing staff.  (*Id.*).  Rummel noted plaintiff had not "been to sick call in the past three months with the complaints you voice in this grievance."  (*Id.*).

On June 2, 2011, plaintiff submitted an Inmate Sick-Call Request complaining that for months he had been experiencing a numb left arm and hand, weakness, weight loss, cold sweats, light-headedness, and "get[ting] extra hungry after eating some particular meals[.]" (Doc. 82-1, p. 6).  A nurse examined plaintiff the next day. (Doc. 78-4, p. 12).  Because his weight (160 pounds) and labs were within normal limits, the nurse kept plaintiff on the regular diet.  (*Id.*).

In an Inmate Request dated July 30, 2011, plaintiff asked for additional blood work to evaluate his thyroid condition and test for anemia.  (Doc. 78-8, p. 1).  Nichols granted plaintiff's request, (*id.*), and scheduled a thyroid profile and complete blood count (doc. 78-4, p. 13).  Staff took the blood sample from plaintiff on August 8, 2011.  (Doc. 78-4, p. 13).  On August 22, 2011, plaintiff requested the results of the blood tests.  (Doc. 78-8, p. 2).  In response, Nichols advised plaintiff "your tests are all normal.  Your thyroid is now normal.  You are not anemic." (*Id.*).

On August 27, 2011, plaintiff submitted another Sick-Call Request, asserting that forty-five minutes after eating breakfast, he was trembling, sweating, and eventually "blacked out" and woke up on the side of the toilet.  (Doc. 82-1, p. 2). Plaintiff noted he had "complained about these particular meals before[.]" (*Id.*).  At sick-call on August 29, 2011, plaintiff complained of weight loss, frequent sweating,

trembling, trouble swallowing, and increased thirst.  (Doc. 78-4, p. 14).  Nurse Von

Oven examined plaintiff and referred his chart to Nurse Nichols.  (*Id.*).  Because

plaintiff's "accucheck was 179," Nichols "ordered lab tests to evaluate for diabetes."

(Doc. 78-1, p. 2).  Lab work performed on August 31, 2011, produced normal results.

(*Id.*).  Nichols spoke with plaintiff on September 12, 2011, and advised him he was

not diabetic.  (*Id.*; doc. 78-4, p. 15).

In a Sick-Call Request dated November 15, 2011, plaintiff stated he was "well

underweight"; he also complained that after eating the morning meal he became weak

and experienced chills, cold sweats, blurry vision, and tingling in his feet.  (Doc. 82-

1, p. 3).  Plaintiff noted he had "been tested over and over again for diabetes and

came up negative on result[.]"  (*Id.*).  Plaintiff went to sick-call on November 17,

2011, and stated that after eating "something sweet in the morning he then feels weak,

breaks out in a cold sweat, and his eyes get blurry."  (Doc. 78-4, p. 16).  Plaintiff

weighed 150 pounds and his blood sugar level was 134.  (*Id.*).  Nurse Von Oven

indicated the plan was to refer plaintiff's "chart to ARNP."  (*Id.*).

On December 12, 2011, plaintiff complained of dizziness and declared a

medical emergency.  (*Id.*).  He thought his blood sugar was up and indicated he was

losing weight.  (*Id.*).  He weighed 148 pounds, his blood sugar level was 97, and his

body mass index was 20.6.  (*Id.*).  Nurse Von Oven noted plaintiff had already been checked for diabetes and concluded no treatment was necessary.  (*Id.*).

Plaintiff returned to sick call on December 19, 2011, and told Nurse Von Oven he felt dizzy and lightheaded after eating.  (Doc. 78-4, p. 17).  He weighed 148 pounds and his blood sugar level was 139.  (*Id.*).  Nurse Von Oven referred plaintiff to Nurse Nichols due to plaintiff's multiple sick calls.  (*Id.*).  On January 3, 2012, plaintiff filed a formal grievance alleging (1) Nurse Nichols refused to see him despite a  referral; and (2) he was receiving inadequate treatment.  (Doc. 82-1, p. 55-56).  Dr. Rummel denied the formal grievance on January 11, 2012, and informed plaintiff he was "scheduled to be evaluated by one of our clinicians very soon." (Doc. 82-1, p. 53).

Nichols examined plaintiff on January 13, 2012; he weighed 150 pounds and his blood sugar registered in the 130s.  (Doc. 78-4, p. 17).  Plaintiff complained of weakness and dizziness after eating certain foods.  (*Id.*).  Nichols advised plaintiff to "not eat foods that cause you to feel bad."[4]  (Doc. 78-1, p. 2; doc. 78-4, p. 17).  Plaintiff indicated he had to eat those foods or he would lose weight.  (Doc. 78-4, p. 17).  Nichols informed plaintiff that she would not give him a special diet.  (*Id.*).

---

[4] Nichols asserts "it is not possible to create a diet for each individual inmate to not include foods they do not like or that bother them."  (Doc. 78-1, p. 2).

Plaintiff "had no physical evidence of any health problem caused by eating the food." (Doc. 78-1, p. 2).

On February 13, 2012, plaintiff returned to sick call and reported lightheadedness, weakness, and headaches. (Doc. 78-4, p. 18). He requested a 4000 calorie diet. (*Id.*). Nurse Austin noted plaintiff's blood sugar level was 92, he weighed 147 pounds, and his body mass index was 20.5, which was within the "normal" range. (*Id.*). Austin declined to issue a special diet but recommended Ibuprofen as needed for headaches. (*Id.*).

On February 26, 2012, plaintiff requested an HIV test and also a blood test to evaluate his thyroid. (Doc. 82-1, p. 47). Nichols informed plaintiff that "HIV testing is the only test you can request. I will put you on the list for that." (*Id.*). Plaintiff, however, refused the HIV test on March 12, and March 19, 2012. (Doc. 78-4, p. 19).

Plaintiff returned to sick call on April 23, 2012. (Doc. 78-4, p. 20). He reported headaches, dizziness, and weakness due to eating certain foods and requested substitutes for the foods he believed caused the symptoms. (*Id.*). He weighed 149 pounds and his blood sugar level was 162. (*Id.*). Nurse Von Oven assessed plaintiff with "subj[ective] dizziness [and] weakness" and found no treatment or diet were needed. (*Id.*)

The FDOC transferred plaintiff to Okaloosa Correctional Institution in September of 2012.  (Doc. 78-4, p. 24).  On October 27, 2012, Okaloosa CI medical staff examined plaintiff at sick-call.  (Doc. 78-4, p. 26).  Plaintiff complained that "when eating breakfast items high in sugar, he gets shaky, dizzy, and sweaty."  (*Id.*). The examining nurse referred plaintiff to a clinician to address his complaints.  (*Id.*). On October 30, 2012, Nurse Wolf examined plaintiff and scheduled a "4 hour glucose tolerance draw, CMP, CBC, and thyroid panel."  (*Id.*, p. 78-4, p. 27).  The four-hour glucose tolerance test yielded normal results.  (*Id.*, p. 28).

In addition to the chronological record of health care detailed by the parties' exhibits, plaintiff has submitted declarations from two of his fellow inmates.  (Doc. 82-1, p. 72-75).  Charles Bernard Robinson, Jr., states he "witnessed and observed inmate Thompson losing weight, meals affecting his sugar[.]" (*Id.*, p. 72).  Robinson also states he observed plaintiff writing grievances, and plaintiff informed Robinson the grievances were "against a Nurse Ms. Marsha Nicols and more of the their negligence." (*Id.*, p. 72-73).  Although Robinson also indicates staff "tried on many times to discipline inmate Thompson for his participation in the grievance process," (*id.*, p. 73), Robinson fails to specify what the discipline consisted of or when it occurred.

The second inmate declaration is from Felix J. Martinez, an inmate who shared a cell with plaintiff for three months.  (*Id.*, p. 74).  Martinez states he was "a witness to the symptoms that kept the plaintiff confined to his bed, and that at those times he suffered from headaches, dizziness, and cold sweat[s].  Affected the plaintiff's normal daily activities, exercise, or even communication."  (*Id.*).  Martinez indicates he would "trade [plaintiff] parts of [his] meals to help him get through the day without hunger or headaches."  (*Id.*).  Martinez ends the declaration by stating he heard plaintiff "complain to staff over and over again declaring medical emergencies and asking for sick call forms only to be denied."  (*Id.*).

DISCUSSION

<u>Legal Standards</u>

    A.    Summary Judgment Standard

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "[T]he plain language of Rule 56(a) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element

essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 160 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *Id.* An issue is "genuine" if the record taken as a whole could lead a rational fact finder to find for the non-moving party. *Id.* Summary judgment is not appropriate "if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact." *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 594 (11th Cir. 1995). Generally, a court must view the facts in the light most favorable to the non-moving party (here, plaintiff) and draw all reasonable inferences in favor of that party. *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1303 (11th Cir. 2009). The court may not, however, accept any facts that are "blatantly contradicted by the record, so that no reasonable jury could believe [them]." *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007). Moreover, "the nonmoving party cannot create a

genuine issue of material fact through speculation, conjecture, or evidence that is 'merely colorable' or 'not significantly probative.'" *Vega v. Invsco Group, Ltd.*, 432 F. App'x 867, 869-70 (11th Cir. 2011).

B.    Eighth Amendment Standard

"In order to prevail on a civil rights action under § 1983, a plaintiff must show that he or she was deprived of a federal right by a person acting under color of state law." *Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1303 (11th Cir. 2001).  A § 1983 claim arises when prison officials act with deliberate indifference to an inmate's serious medical needs, which violates the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104-05, 97 S. Ct. 285, 291, 50 L. Ed. 2d 251 (1976); *see also Harris v. Thigpen*, 941 F.2d 1495, 1504 (11th Cir. 1991) ("Federal and state governments . . . have a constitutional obligation to provide minimally adequate medical care to those whom they are punishing by incarceration.").  "To prevail on a deliberate indifference to serious medical need claim, Plaintiffs must show: (1) a serious medical need; (2) the defendants' deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306-07 (11th Cir. 2009).  "A serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person

would easily recognize the necessity for a doctor's attention." *Id*. at 1307 (quotation omitted); *see also id.* (*quoting Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003)) ("[T]he medical need must be one that, if left unattended, poses a substantial risk of serious harm.").

To show a defendant was deliberately indifferent, a plaintiff must prove: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than gross negligence." *Goodman v. Kimbrough*, 718 F.3d 1325, 1331-32 (11th Cir. 2013) (*quoting Townsend v. Jefferson Cty.*, 601 F.3d 1152, 1158 (11th Cir. 2010)). "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994). To establish deliberate indifference, the defendant's response to the medical need must be more than "merely accidental inadequacy, negligence in diagnosis or treatment, or even medical malpractice actionable under state law." *Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000) (citation and quotations omitted). Prison officials may avoid Eighth Amendment liability by showing, for example: (1) "that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger;"

(2) that "they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent;" or (3) that "they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844.

<u>Application of Summary Judgment Standard to Plaintiff's Claim</u>

Plaintiff claims defendant Nichols violated his rights under the Eighth Amendment by failing to provide him with a diet change and failing to provide treatment for his complaints of headaches, left arm numbness, dizziness, weakness, and cold sweats.  (Doc. 82, p. 2).  Assuming, *arguendo*, plaintiff's complaints constituted a serious medical need, he cannot establish an Eighth Amendment claim against Nichols because the evidence does not permit a reasonable jury to conclude Nichols exhibited deliberate indifference to that need.

Plaintiff's Inmate Requests, Sick-Call Requests, and health record indicate he consistently complained of symptoms such as lightheadedness, weakness, dizziness, headaches, weight loss, and numbness in his extremities.  Plaintiff believed the symptoms were related to particular meals in his diet.  The evidence reflects, however, that Nurse Nichols and the staff at Santa Rosa CI consistently examined plaintiff and monitored his condition.  In addition, when Nichols found it appropriate,

she ordered diagnostic testing to evaluate plaintiff's condition. After considering the medical evidence, Nichols concluded changing plaintiff's diet was not medically necessary. Although plaintiff disagrees with Nichols' conclusion, "a simple difference in medical opinion between the prison's medical staff and the inmate" regarding the course of his treatment does not establish an Eighth Amendment claim. *Harris*, 941 F.2d at 1505; *see also Adams v. Poag*, 61 F.3d 1537, 1545 (11th Cir. 1995) ("[W]hether governmental actors should have employed additional diagnostic techniques or forms of treatment is a classic example of a matter for medical judgment and therefore not an appropriate basis for grounding liability under the Eighth Amendment.") (quotation marks omitted).

Plaintiff also claims Nichols failed to provide any care for his symptoms. Plaintiff's symptoms, however, were not supported by any objectively identifiable medical condition.[5] As Nichols states in her declaration:

> This inmate had no physical evidence of any health problem caused by eating the food. All of his complaints were evaluated with lab test[s] and physical examination and nothing [was] found to indicate there was any health problems caused by food.

(Doc. 78-1, p. 2). Nichols' failure to provide treatment for complaints unsupported

---

[5] Dr. Rummel suggests plaintiff's anxiety issues could have been the cause of his symptoms. (Doc. 78-2, p. 2).

by any medical evidence does not constitute deliberate indifference. *See Harris*, 941

F.2d at 1505 ("Medical treatment violates the eighth amendment only when it is 'so

grossly incompetent, inadequate, or excessive as to shock the conscience or to be

intolerable to fundamental fairness.'") (*quoting Rogers v. Evans*, 792 F.2d 1052, 1058

(11th Cir. 1986)).  If the court adopted plaintiff's view, prisoners could dictate their

preferred medical treatment through verbal complaints despite a lack of medical

evidence supporting the treatment preferred by the prisoner, and without any showing

– applying the traditional standard – of deliberate indifference.   The Eighth

Amendment does not impose such a requirement on prison staff (nor provide that

luxury to prisoners).   Although plaintiff disapproves of the care he received, the

record demonstrates that the medical attention provided by defendants and others

over a number of years at Santa Rosa CI maintained his physical health in a more or

less stable condition.   The diet and related claims against defendant Nichols, as

further discussed below, do not present a close question.

Plaintiff argues there is a dispute as to whether his blood sugar level–as

measured by multiple Accu-Chek tests–was "ever abnormal to the point that made his

diet questionable, because of the risk of substantial harm."   (Doc. 82, p. 2-3).

Plaintiff notes Accu-Chek tests performed on August 29, November 17, and

December 19, of 2011, yielded results of 179, 134, and 139, respectively.[6]  Nichols

also noted plaintiff's blood sugar was in the 130s on January 13, 2012.

In support of their motion for summary judgment, defendants submitted

declarations from defendant Rummel and Dr. Albert Maier stating:

> None of [plaintiff's] blood sugar tests were high when checked by
> laboratory blood draw.  Only the finger stick accucheck were over one
> hundred and those were performed after Plaintiff ate and were expected
> to be over 100.  Plaintiff's blood sugar was never near fatal as he alleges
> because blood sugars are not fatal unless they get very high, 700 or
> above.

(Doc. 78-2, p. 2; doc. 78-3, p. 1).  In response, plaintiff notes the medical staff

performed the tests approximately three hours after plaintiff ate breakfast.[7]  (Doc. 82,

p. 2-3).  Plaintiff asserts the fact his blood sugar levels remained high three hours

after eating is "not normal and is a genuine dispute, but the record favors the plaintiff

claim of abnormal blood sugar."  (*Id.*, p. 3).  Plaintiff also argues Nichols' decision

to order lab work following his August 29, 2011 visit "prove[s] a concern with

plaintiff's sugar level[.]"  (*Id.*).

---

[6] In his response to defendants' motion for summary judgment, plaintiff asserts "a normal blood sugar level would be between 60-120."  (Doc. 82, p. 2).

[7] Plaintiff claims "the blood sugar obviously was higher even an hour or two after he ate, proving Dr. Albert Maier's conclusion that those accuchecks were done after the plaintiff had eaten to be inaccurate."  (Doc. 82, p. 2-3).

This latter observation by plaintiff, however, actually undermines his Eighth Amendment claim and demonstrates Nichols did not exhibit deliberate indifference to plaintiff's blood sugar levels.  Nichols' willingness to order additional testing following plaintiff's August 29, 2011 Accu-Chek indicates she did not disregard an excessive risk to plaintiff's health.  Those additional tests yielded normal results. (Doc. 78-1, p. 2; doc. 78-4, p. 14).  Nichols concluded plaintiff did not have diabetes and treatment was unnecessary.  (Doc. 78-4, p. 15).  Although Nichols did not order additional tests after every subsequent Accu-Chek, none of the later Accu-Cheks registered as high as the one on August 29, 2011.  Nichols' response to the Accu-Chek tests was not "very unreasonable in light of a known risk" of harm or suffering. *Hardin v. Hayes*, 52 F.3d 934, 939 (11th Cir. 1995) (*citing Farmer*, 511 U.S. at 836-37).

Next, plaintiff argues the variations in his weight supported the necessity of a diet change.  (Doc. 82, p. 3).  On December 1, 2010, Nichols placed plaintiff on a 4000 calorie diet because he weighed 146 pounds and suffered from hyperthyroidism. (Doc. 78-1, p. 1; doc. 78-4, p. 5).  Nichols discontinued the 4000 calorie diet on March 2, 2011, because plaintiff's hyperthyroidism had resolved and his weight increased to 160 pounds.  (Doc. 78-4, p. 11).  Nichols denied plaintiff's subsequent

requests for a diet change, asserting a change was not necessary.  Plaintiff notes he weighed 148 pounds in December of 2011 and 147 pounds on February 13, 2012. Plaintiff asserts a jury could conclude Nichols should have re-ordered the 4000 calorie diet because his weight on these occasions was similar to the weight at which he previously received the 4000 calorie diet.  (Doc. 82, p. 3).

Although plaintiff received a 4000 calorie diet when he weighed 146 pounds, he overlooks the fact he also suffered from hyperthyroidism at the time.  (Doc. 78-4, p. 5).  As Drs. Rummel and Maier's declarations indicate, hyperthyroidism can result in weight loss.  (Doc 78-2, p. 2; doc. 78-3, p. 1).  When Nurse Nichols discontinued the 4000 calorie diet she specifically noted both that his weight was "up" and "thyroid no longer hyper."  (Doc. 78-4, p. 11).  Furthermore, although plaintiff weighed 147 pounds on February 13, 2012, Nurse Von Oven concluded plaintiff did not need a special diet because his body mass index was 20.5, within the normal range of 18.4 to 24.9.  (Doc. 78-4, p. 18).  Nichols' failure to issue a 4000 calorie diet when plaintiff weighed 147 or 148 pounds does not constitute deliberate indifference because he was not suffering from hyperthyroidism at the time and his body mass index fell within a normal range.[8]

---

[8] It is doubtful plaintiff's thirteen-pound weight loss (from 160 lbs to 147 lbs) independently constitutes an objectively serious medical need.  *See Venturi v. Boyd*, Case No. 3:14cv823-CLS, Case No. 3:11cv423/RV/CJK

Plaintiff next contends Nichols failed to see him despite a referral from another nurse and Nichols failed to provide him with the results of his blood tests. (Doc. 82, p. 4). After examining plaintiff on a December 19, 2011 sick call, Nurse Von Oven indicated plaintiff would be referred to an ARNP. (Doc. 78-4, p. 17). On January 3, 2012, plaintiff submitted a formal grievance complaining that Nurse Nichols refused to see him. (Doc. 82-1, p. 55). Defendant Rummel responded on January 11, 2012, and informed plaintiff he was "scheduled to be evaluated by one of our clinicians very soon. Discuss your medical concerns at that time. If you feel you cannot wait for the scheduled appointment sick call is available." (Doc. 82-1, p. 53). On January 13, 2012, Nurse Nichols examined plaintiff. (Doc. 78-4, p. 17). The fact plaintiff had to wait 25 days between his examination by Nurse Von Oven and his examination by Nurse Nichols does not indicate Nichols "refused" to see plaintiff or that she was deliberately indifferent to his medical needs. As noted by Dr. Rummel, plaintiff could access sick call if he felt immediate attention was necessary. Plaintiff notes Nurse Von Oven referred him to Nichols on August 29, 2011, and Nichols ordered lab tests the same day. Nichols then discussed the results with him on September 12,

---

2014 WL 5824641 at *4 n.6 (N.D. Ala. Nov. 10, 2014) (noting "moderate weight loss alone is not sufficiently serious to rise to the level of an unreasonable risk to a prisoner's health or safety" and finding 22 pound weight loss over seven month period "does not indicate a medically serious weight loss").

Case No. 3:11cv423/RV/CJK

2011.  Plaintiff asserts Nichols' prompt response on that occasion indicates she refused to see him after the referral in December.  (Doc. 82, p. 4).  The court, however, cannot draw that inference from the facts.  *See Vera v. McHugh*, 622 F.3d 17, 26 (1st Cir. 2010) (noting that the court, in evaluating a summary judgment motion, will not "draw *unreasonable* inferences or credit bald assertions, empty conclusions, [or] rank conjecture") (*quoting Cabán Hernádez v. Philip Morris USA, Inc.*, 486 F.3d 1, 8 (1st Cir. 2007)).  Although Nichols ordered lab work on August 29, 2011, she did not personally examine plaintiff and discuss the lab results with him until fourteen days later.  The existence of a twenty-five-day delay between referral and examination does not indicate Nichols disregarded an excessive risk to plaintiff's health, especially when she previously evaluated plaintiff for the same complaints and concluded his condition did not warrant treatment.[9]

Plaintiff also claims Nichols refused to inform him of the results of a blood test performed on August 8, 2011.  (Doc. 82, p. 4).  On August 22, 2011, plaintiff submitted an Inmate Request to Dr. Rummel seeking the result of the August 8 tests.  (Doc. 78-8, p. 2).  Nichols responded on August 24, 2011, informing plaintiff "your

---

[9] Nichols' declaration states she "saw [plaintiff] whenever he was referred" to her.  (Doc. 78-1, p. 2).

tests are all normal.  Your thyroid is now normal.  You are not anemic."[10]   (*Id.*).

Plaintiff suggests Nichols' delay in providing the test results "proves a genuine

dispute as to whether plaintiff was being denied medical attention by defendant

Nichols." (Doc. 82, p. 4).  Plaintiff's argument is without merit.  Nichols' failure to

immediately inform plaintiff of test results indicating he did not need treatment does

not support a violation of the Eighth Amendment.

Because plaintiff has failed to establish defendant Nichols exhibited deliberate

indifference to his medical needs, he likewise cannot establish an Eighth Amendment

claim against Nichols' supervisor, Dr. Rummel.  *See Mann v. Taser Int'l, Inc.*, 588

F.3d 1291, 1308 (11th Cir. 2009) ("Plaintiffs' claims under a theory of supervisory

liability fail because the underlying § 1983 claims fail"); *Hicks v. Moore*, 422 F.3d

1246, 1253 (11th Cir. 2005) (where the plaintiff's rights were not violated, "Plaintiff

cannot maintain a § 1983 action for supervisory liability"); *Stringer v. Doe*, 503 F.

App'x 888, 891 (11th Cir. 2013) ("Stringer's claim of failure to train or supervise

against the sheriff fails because he was unable to state a constitutional claim against

---

[10] Plaintiff contends Nichols' response violated the Health Insurance Portability and Accountability Act because it "divulged confidential information through the institution mailing system without sealing where officers and inmates may be able to read personal information." (Doc. 82, p. 4).  Plaintiff claims the information should have been discussed in private. (*Id.*).  Regardless of the veracity of plaintiff's claim, the disclosure of plaintiff's medical information through a grievance response is not relevant to determining whether Nichols violated the Eighth Amendment.

any non-supervisory state actor.").

## CONCLUSION

Although plaintiff consistently complained about his diet, Nurse Nichols monitored plaintiff's condition and responded reasonably based on her examinations and diagnostic testing. Applying the correct standard, the undisputed evidence does not suggest she knew plaintiff faced a substantial risk of serious harm, yet disregarded that known risk by failing to respond to it in an objectively reasonable manner. *See Rodriguez v. Sec'y for Dep't of Corr.*, 508 F.3d 611, 617 (11th Cir. 2007). Moreover, the longitudinal record of plaintiff's health demonstrates his condition remained relatively stable. As Nichols' actions did not display deliberate indifference to plaintiff's medical needs, Dr. Rummel cannot be held liable as Nichols' supervisor. Because no reasonable jury could conclude that the defendants' actions violated the Eighth Amendment, summary judgment should be granted in their favor.

Accordingly, it is respectfully RECOMMENDED:

1.     That defendants' motion for summary judgment (doc. 78) be GRANTED.

2.     That the clerk be directed to enter judgment in favor of defendants and against plaintiff and close the file.

Case No. 3:11cv423/RV/CJK

At Pensacola, Florida, this 11th day of February, 2016.


*/s/ Charles J. Kahn, Jr.*
**CHARLES J. KAHN, JR.**
**UNITED STATES MAGISTRATE JUDGE**


### NOTICE TO THE PARTIES

Objections to these proposed findings and recommendations may be filed within fourteen (14) days after being served a copy thereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of objections shall be served upon the Magistrate Judge and all other parties.   A party failing to object to a Magistrate Judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions.  *See* U.S. Ct. of App. 11th Cir. Rule 3-1; 28 U.S.C. § 636.